ROCKWOOD et al. v. GENERAL FIRE EX-
TINGUISHER CO. et al.

Circuit Court of Appeals, Second Circuit.
January 6, 1930.

No. 94.

Louis W. Southgate and O. Ellery Ed-
wards, both of New York City, for plaintiffs-
appellants.

Charles Neave, of New York City, Edgar
W. Shaw, of Providence, R. I., Alexander C.
Neave, of New York City, and Harry Dexter
Peck, of Providence, R. I., for defendants-
appellants.

Before MANTON, L. HAND, and
MACK, Circuit Judges.

MANTON, Circuit Judge. The reissue
letters patent No. 14,746 sued on in this liti-
gation was found valid and infringed as to
claims 1, 2, 3, 4, and 7 by this court. Rock-
wood v. General Fire Extinguisher Co., 8 F.
(2d) 682, 684. The Supreme Court denied
the writ of certiorari. 269 U. S. 571, 46 S.
Ct. 26, 70 L. Ed. 417. A master appointed
to report an account of the profits and gains
and the damages sustained by the plaintiffs
by reason of the infringement, found profits
of $286,587.32, and that, if recovery be had
on a basis of a reasonable royalty, it was
$294,940, with interest from October 26,
1925. The court below approved the master's
finding as to profits, but overruled his finding
of damages. On the royalty basis, the court
fixed them at 25 per cent. of the manufac-
turer's cost of the infringing valves in the
sum of $104,489.59. The damages were in-

creased threefold under the authority thought to be vested in the court below. Rev. St. § 4919 (35 USCA § 67). Judgment was then entered for the damages on the basis of $300,-000. Both parties have appealed.

The patent is for a dry pipe valve used in an automatic sprinkler system. There are two types of sprinkler systems, known in the trade as the wet pipe and dry pipe systems respectively. In the former, the pipe to which the sprinkler head is attached is always filled with water. The dry pipe system is used in warehouses, car barns, wharfs, and other buildings which are not heated in the winter because it is impractical to have water standing in the sprinkler pipes due to the danger of freezing. Where the dry pipe system is installed, the sprinkler pipes are filled with air instead of water, and the dry pipe valve is interposed between the water supply in the basement and the sprinkler pipes throughout the building. It is this valve which is the subject-matter of the reissue patent in suit. The function of the dry pipe valve is to hold back the water from the sprinkler pipes until, upon fusing one or more of the sprinkler heads, the air escapes from the sprinkler pipes. The dry pipe valve is designed so that a relatively light air pressure on the sprinkler pipe side of the dry pipe valve holds back a heavy water pressure in the water supply side of the dry pipe valve. This is accomplished by so constructing the dry pipe valve that its area, upon which the air pressure acts to hold the valve closed is six times that of the area upon which the water pressure acts to raise the valve to open it. The valve is a circular plate or disc hinged to one side, and its area is five or six times that of the opening of the water pipe. This larger size makes it possible for the small air pressure on the upper side of the plate to counteract a much larger water pressure on the under side. To prevent the valve from opening even a little way and water passing through it or forming a column on the opposite side of the valve, there was fastened to the upper side of the plate a rod which projects at an angle back toward the hinge. On this rod there is a counterpoise so placed that the center of gravity is slightly forward of the hinge, thus tending to keep the valve closed. When the air pressure is reduced, and the valve opens a little way, the counterpoise by the motion passes back of the hinge, and the force of gravity then operates to open the valve wide and keep it open so as to provide a free passage for the water. Prior to this invention, there was a gate type of valve; it was a horizontal cylin-der with a piston working loosely in it at the side of the valve, and the valve plate was fastened to the piston rod. When the air pressure is reduced, the plate is lifted slightly by the water pressure, water rushes into the valve chamber and forces the piston into the cylinder, thereby drawing the valve plate to one side, leaving a free passage of water. It is referred to as the A valve. Later a new valve was constructed. In this the cylinder and one of the other parts were electroplated with copper, and these are referred to as B valves. This was the first in the art to give an unobstructed straight passage for water, and because of that it is referred to as the straightway valve. When this invention was developed, the defendants were making a valve known as the No. 12. It was not satisfactory, and the approval of the fire insurance companies was about to be withdrawn. About this time, August, 1909, plaintiffs' patent issued.

One of the infringing valves is known as the C valve. It involves the Rockwood invention and also that of Loepsinger, the defendant's engineer. In 1922, Loepsinger made a further invention which is embodied in the D valve, also in controversy. After the C valve was made, the defendants gradually abandoned the B valve, the number of the latter dropping from 1,471 in 1916, 1,225 in 1917, 97 in 1918, 107 in 1921, to 38 in 1922; while the C valve increased from 1 in 1916 to 1,178 in 1922, and then the D valve began to take the place of the C valve. The plaintiffs' production totaled about 8,000 valves down to the time of the accounting, while the defendants sold 1,053 A valves between 1907 and 1909 and 13,477 B valves from 1910 to 1926; but in the last six years less than 40 were sold annually. Of the C valves, 4,870 were sold, but the reissue statute compels the plaintiffs to abandon claim for those sold before the reissue. Of the D valves, 2,815 were sold. The reissue was obtained October 28, 1919, and on November 10, 1919, the plaintiffs notified the defendants of the reissue and asked them to cease making and selling dry valves in infringement of it. Upon refusal, this suit was started by Rockwood, and later, by amendment, the Rockwood Sprinkler Company was joined as party plaintiff.

The number of valves involved in the accounting is 6,220. The manufacturing profit on these valves was $158,795.47, without the introduction of interest on the investment. The Grinnell Company made installations using 4,742 valves, and used in replacement 1,478. The Grinnell Company's profit on the valves sold for replacement was $88,060.93.

The principal question presented on this appeal is whether the award should be based on the profit made by the Grinnell Company upon valves used by it in the sale of completed installations of sprinkler equipment or an apportionment of profit, or whether a reasonable royalty should be ascertained and paid as damages. Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U. S. 604, 32 S. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653; Warren v. Keep, 155 U. S. 265, 15 S. Ct. 83, 39 L. Ed. 144; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398; Elizabeth v. Nicholson Pavement Co., 97 U. S. 126, 24 L. Ed. 1000. Where the 4,-742 valves were used in the completed sprinkler installations, a charge was made for the entire apparatus including the valve. There was no separate or segregated charge for the dry pipe valve. Where the 1,478 valves were sold as separate articles, they were sold otherwise than as part of the sprinkler installations. The master found that the profit of the valves sold otherwise than as part of the sprinkler system installation was readily ascertainable. He took this profit and applied it to those valves so sold and to those which were used as a part of the completed sprinkler installation. He found the figure to be $453,846.06 after deducting interest on the capital invested. From this figure, he deducted $167,258.54, representing a saving in the cost of valve structure due to inventions by the defendants' engineer, Loepsinger, leaving $286,587.52, which he found to be the amount of the recoverable profits. In reaching the conclusions as to reasonable royalty, the master found the Rockwood Sprinkler Company had voted to pay Rockwood a royalty of $50 on 6″ valves; $40 on 5″ valves, and $30 on 4″ valves and applied these figures to the number of valves of corresponding sizes sold by the defendants, reaching $294,940 as a reasonable royalty damage, and directed interest from the date of the order on the mandate. The District Court agreed with the calculations upon which the profit was reached, but disagreed as to the royalty basis, and, stating the amount at $104,489.50, the court trebled the damages, and then concluded that $300,000 should be the amount.

The defendants maintain that the sale prices on the valves separately sold were at a special high price, and the profits on valves thus sold are not applicable as the price of the valves used as part of the completed installation. They argue that the valves "sold otherwise" were part of the "special price,"

and could not be a basis for determining the profits made upon the valves furnished as part of the sprinkler system. The valves sold as classified by the master were (a) valves sold in replacement; (b) valves sold for additions or alterations; and (c) valves sold to dependable sprinkler contractors. He found the first class to be negligible because there was no electroplating on C and D valves to corrode. There was no wear and tear on the valves; they were not operating. He found there were few replacements of B valves and practically none of the C and D valves. There were, however, 12,211 of No. 12 valves put in service between 1885 and 1905. There were 1,482 C and D valves "sold otherwise" which may have been replacements for No. 12, resulting in replacements of about 13 per cent. of the No. 12 valves in service over a long period of time. There is considerable doubt from the testimony as to how much of the seven or eight thousand No. 12 valves, no longer in use, were replaced by the C and D valves. But, if all the valves "sold otherwise" were so used, it would be from one-sixth to one-fifth of these idle No. 12 valves which were replaced. There is therefore, a considerable doubt as to the number of the valves "sold otherwise" which were sold to contractors. This illustrates the uncertainty of determining the profits made on valves "sold otherwise" as a basis of determining the profits on the valves used as part of the sprinkler system.

In Westinghouse Co. v. Wagner Co., 225 U. S. 605, 32 S. Ct. 691, 694, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653, the Supreme Court, in announcing the principles to guide the courts in determining when profits should be paid by an infringer, said:

"Where profits are made by the use of an article patented as an entirety, the infringer is liable for all the profits 'unless he can show —and the burden is on him to show—that a portion of them is the result of some other thing used by him.'"

But the patent here did not cover an article as an entirety. In holding the patent valid, we said it was "an improved dry valve." 8 F.(2d) 682, 684. There were dry pipe valves before Rockwood's, although not satisfactory. This inventor took a dry pipe valve with its characteristics of differential area, two valves on a rocker arm, and added a new element, the counterweight. In doing so, he enabled the counterweight to counterbalance the weight of the other moving parts. This did not change their function. In making his invention, he took from the prior art

much of the detailed construction and added thereto this counterweight. The counterweight did not extend to every part of the whole structure, nor did it affect the differential. Nor did it create two valves carried upon a single rocking lever arm, but it enabled the inventor to apply the added counterweight and its weight in holding the valves shut when they were shut and holding them open when they were open. The invention resides in the counterweight and the recognition of and the use to be obtained from the law of gravity. Herman v. Youngstown Car Mfg. Co. (C. C. A.) 216 F. 604. This was an improvement over elements found in the No. 12, the Crosby, and the straightway valve, as the master found.

■ The acceptance of the valve in the market depends upon the approval of the insurance interests, the size and price and accessability of the operating parts. The No. 12 Grinnell straightway valve had been approved by the insurance laboratories, and there were some dozen others also approved. The infringing valves were approved, and the master found that the preference for them was due to the gravity action and that the Loepsinger patented idea in them had to do with the economy of production. The lower price of the C and D valves was influenced by the size of the structure. Loepsinger's invention related to using differential leverages in addition to differential areas, and the use of such leverages was not altogether dependent upon counterweights. His introduction of the differential of leverage idea cut the size of the air valve and water valve ratios from over six to one to three to one, reducing the size about one-half. This resulted in the lower price. In the C and D valves, the swinging or moving parts could be swung out through the hand hole, and could be conveniently examined, and, if necessary, be replaced without removing the valve from the line. This gave them value for accessability which appealed to the laboratories. In view of this, the record does not warrant holding that the profits were made by the use of the article as an entirety, and, though there be infringement, the evidence shows that a portion of the entire structure of the valve which was sold resulted in profits from other things being used by the infringer in addition to the improvement of the plaintiff. It was established that the C and D valves had efficient and reliable latch mechanisms. There were valve seats in the C and D valves which were carried on one pivoted arm capable of rocking it upon the valve and rubber facing. The one-piece body of Loepsinger was produced from a casting

that would withstand heavy water pressure. This requires us to conclude that the more equitable response which the infringer should make to this plaintiff is upon the basis of payment of a reasonable royalty. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398. Moreover, it falls within that classification stated in the Westinghouse case as follows:

"But there are many cases in which the plaintiff's patent is only a part of the machine and creates only a part of the profits. His invention may have been used in combination with valuable improvements made, or other patents appropriated by the infringer, and each may have jointly, but unequally, contributed to the profits. In such case, if plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains. He must therefore 'give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.'"

■ The burden of apportionment was on the plaintiffs, for it was only entitled to recover such part of the commingling profits as was attributable to the use of its invention. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., supra; Metallic Rubber Tire Co. v. Hartford Rubber W. Co. (C. C. A.) 275 F. 315; Underwood Typewriter Co. v. E. C. Stearns & Co. (C. C. A.) 227 F. 74. The plaintiffs, having failed to bear the burden of apportionment, must necessarily resort to damages fixed on the basis of a reasonable royalty. Gear Grinding Machine Co. v. Studebaker Corp. (C. C. A.) 4 F.(2d) 510; Egry Register Co. v. Standard Register Co. (C. C. A.) 23 F.(2d) 438.

■ The master found a reasonable royalty, arrived at as stated above. The Rockwood Sprinkler Company was the sole and exclusive licensee. Rockwood owned 51 per cent. of the voting stock of that company, and negotiated the license with it. Prior to 1919 there was an understanding as to royalties between them whereby Rockwood was to receive a royalty for his devices as soon as the company had the money to pay royalties. On February 15, 1919, a resolution was passed

by the corporation providing for such royalty. The circumstances under which this resolution was passed would not permit accepting the sums to be paid by the Rockwood Sprinkler Company as determinative of the payment of a reasonable royalty which should be made by this infringer, for the royalties were practically fixed by Rockwood and the amounts are high. Rude v. Westcott, 130 U. S. 152, 9 S. Ct. 463, 32 L. Ed. 888; American Sulphite v. De Grasse Paper Co. (C. C. A.) 193 F. 653; Walker on Patents (6th Ed.) p. 668, § 601. The sums were not always paid. The testimony of Grinnell, wherein he stated that from 20 to 25 per cent. over cost would be an "ordinary manufacturing profit," should not be accepted as a reasonable royalty. In fixing the measure of damages on a royalty basis against an infringer, it should be based on a sum which is reasonable and indicates a general acquiescence on the part of the prudent purchaser to pay for the increased market value due to the improvement. The defendants, one the manufacturer and the other the seller, a subsidiary company, as between themselves, charged the subsidiary 33⅓ per cent. manufacturing cost. An amount must be found which a person, desiring to manufacture and sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make and sell the patented article, in the market, at a reasonable profit. Merrell Soule Co. v. Powdered Milk Co. (C. C. A.) 7 F. (2d) 297; Austin-Western Road Machinery Co. v. Disc G. & P. Co. (C. C. A.) 291 F. 301. Mr. Park testified that $175 per valve would be a reasonable royalty to pay for the use of the patent. He based this opinion upon the claim that there is no other satisfactory valve than the plaintiffs', and that this one was essential to the sprinkler system. In view of what we have said as to other things entering into the defendants' valves, we cannot accept his opinion as to a royalty to be fixed on the basis that the patented valve is essential to the sprinkler system. The C and D valves had the benefit of saving due to the Loepsinger invention. In that invention there was a saving over the manufacturing cost of making the Rockwood valve. Deducting this saving in cost, $93.91, from the price, we have for the 6″ C valves for 1919 and 1920 a remainder of $114.97; for 1921 and 1922, $101.04; for the 5″ C valves, $77.47; for 1919 and 1920, $66.04; for 1921 to 1925 for the 6″ D valve, $73.04. Overhead and interest on the investment must be deducted; they are not included in the estimated manufacturing cost of the Rockwood valve. Considering these elements of costs, the overhead of the Grinnell Company and its codefendant, the General Fire Extinguisher Company, and the interest which should be allowed on the investment, and finding the profit, and having due regard for the element of improvement contributed by Rockwood's invention, a reasonable royalty of $33 per valve upon the 6,220 valves sold, or a total of $205,260 should be paid.

Punitive damages should not have been awarded by the court below. The infringement was not wanton and deliberate. The validity of the patent and its infringement was open to honest doubt, and it was not until this court passed upon the question that the defendants were found to infringe. In the absence of a deliberate purpose to infringe, no such punitive damages should have been granted. Oehring v. William Gardam & Sons (C. C. A.) 202 F. 753; Metallic Rubber Tire Co. v. Hartford Rubber W. Co. (C. C. A.) 275 F. 315.

Since the damages are ascertained upon the basis of a reasonable royalty, interest on the award begins from the date of the last infringement. Starr Piano Co. v. Auto Pneumatic Action Co. (C. C. A.) 12 F.(2d) 586; Merrell Soule Co. v. Powdered Milk Co. (C. C. A.) 7 F.(2d) 297; Superior Machine Tool Co. v. Cincinnati Lathe & Tool Co. (C. C. A.) 284 F. 267.

The claim of damages for the Rockwood Sprinkler Company must be disallowed. It held a license under the patent, and, assuming it was an exclusive license for the whole period to make, sell, and use the patented valve, it is an assignee and entitled to all the damages. If it is less than that, it could not recover damages at all. There was no proof to show that the sales with which the defendants are charged would have been made by them. But they cannot share in a royalty which we are requiring the defendants to pay on the sales which they made.

The decree will be modified, fixing the reasonable royalty at $205,260, with interest from the date of the last infringement and costs of this appeal to the plaintiff.