**PANDUIT CORPORATION, Plaintiff-Appellee,**

v.

**STAHLIN BROS. FIBRE WORKS, INC., Defendant-Appellant.**

**No. 19786.**

United States Court of Appeals, Sixth Circuit.

Aug. 7, 1970.

**222**

John D. Simpson and A. James Valliere, Chicago, Ill., Robert A. Stenzel, Donald J. Simpson, Hill, Sherman, Meroni, Gross and Simpson, Chicago, Ill., on the brief, for appellant.

Roy E. Petherbridge and John M. O'Neill, Chicago, Ill., Petherbridge, O'Neill & Lindgren, Chicago, Ill., on the brief, for appellee.

Before WEICK, EDWARDS, and CELEBREZZE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal from an order of the United States District Court for the Western District of Michigan, Southern Division, holding a patent on an electrical wiring duct owned by the Panduit Corporation, U. S. Patent No. 3,024,301, issued on March 6, 1962 to K. R. Walch [hereinafter the "Walch" patent], valid and infringed by two devices manufactured by Stahlin Bros. Fibre Works, Inc. 35 U.S.C. §§ 101, 102, 103 (1964). Stahlin Bros. appeals, asserting various errors of fact, procedure, and law.

The patent in suit is on a rack for supporting, orienting and arranging wires in electrical circuits. Similar devices are reasonably familiar: they are commonly used to support and arrange wires in radios, phonographs, televisions, and other electrical circuits. The patent was awarded to Walch, an employee of the General Electric Company, after an interference proceeding in the patent office between Walch and Mr. Jack E. Caveney, president of the Panduit Corporation, whose application on a similar rack, the "Panduit Duct," was filed shortly after the Walch application. Claim 5 of the Walch patent, the only claim in issue in the instant proceedings, was the claim in interference on which Walch was awarded priority of invention. Subsequent to the issuance of the patent to Walch, Panduit Corporation purchased the Walch patent from General Electric.

Claim 5 provides:

"5. A wall for supporting and orienting wires comprising a side wall having longitudinally spaced substantially parallel slits open at one edge of said wall and defining substantially parallel edges on longitudinally spaced fingers, the free ends of said fingers being enlarged to narrow the outer ends of the slits and provide restricted passages for the wires between the finger ends and thereby prevent accidental removal of the wires from between the fingers, said fingers being flexible to permit their deflection and provide wider spacing at their free ends to facilitate positioning and removal of wires between said fingers."

Restated, claim 5 described a wiring duct composed of a strip of material (plastic, wood, metal, etc.) with one or two rows of flexible, perpendicular, finger-like projections (the "side walls") attached to its edge or edges. The fingers are spaced evenly apart, the distance between two adjacent fingers on the same side of the strip being roughly equal to the diameter of wires being carried through the duct. Wires being carried through the duct enter and leave through these "substantially parallel slits" between the fingers. To prevent slippage or accidental removal of wires passing between adjacent fingers, the free ends of the fingers are enlarged into knobs; consequently, the distance between adjacent fingers at their free ends may be somewhat less than the diameter of wires passing between them. Being flexible, the fingers may be bent toward or away from the backing strip to provide wider spacing at the free ends of the fingers,

and facilitate placement, positioning, and removal of wires.

Prior to 1955, the year Walch filed his patent application, several techniques and devices were used to order and arrange wires in electrical circuits, or electrical control panels. The "flat wiring" method, for example, did not require the use of ducts: wires were simply laid flat against the back wall of the control panel. The "tied" or "laced" cable method, similarly, did not require the use of special ducts: wires between electrical components were installed loosely in the electrical control panel and then laced together with ties. Although both these methods, "flat wiring" and "laced" cable, were in common use in the late 1920's, each had drawbacks that were well recognized by industry people. Consequently, between 1930 and 1955, a spate of patents were acquired on various types of wiring ducts. One acquired by General Electric in the 1930's, for example, was a three-sided metal duct with perforated round holes in its side walls. Wires carried through the duct entered and left through these holes, through which they had to be threaded. U. S. Patent No. 2,006,150. This duct, as all others with holes in their side walls, had the disadvantage that wires could not be removed from the duct, or repositioned within it, unless they were first disconnected from the components they connected, and threaded back through the holes. The District Court found, from substantially undisputed testimony, that a wire near the bottom of such a duct could often not be removed from it unless the wires above it were also removed. Round hole ducts had the added disadvantage that, being inaccessible, wires could not be traced to their origin or rearranged in the control panel without dis-assembling it.

At trial, Stahlin Bros. tested the validity of the Walch patent against two such prior art devices which had not been before the patent office, notwithstanding its seven searches: the Taylor duct and the Franz patent, U. S. Pat. No. 2,712,-916.

The Taylor duct is a three-sided duct made of a "rigid thermo-plastic" material, according to the Taylor Electric Company brochures describing it. The Taylor duct has rows of holes in its side walls, the number of rows varying depending upon whether the customer selects a one-inch or four-inch high duct, or some intermediate size. The higher the side wall, the greater the number of holes. Slits from the top of the side wall to the top row of holes form apertures. The side wall between these apertures may be deflected in much the same way as the fingers of the Walch device to increase the size of the aperture and allow for easier placement of wires into the top row of holes. In all but the one-inch high duct, there are more than one row of holes, and the holes in the bottom row, or rows (there may be as many as three rows), are closed. The only way wire can be placed in these lower holes is to thread it through the side wall.

At trial, Stahlin Bros. emphasized most greatly the similarities between the one-inch high Taylor duct and the Walch device. It introduced various testimony and exhibits tending to show that the material between the holes in the side walls of the Taylor device could be deflected much in the same way as the fingers of the Walch device to facilitate placement of wires into the holes.

The Taylor Duct

[A2379]

(Photograph from an advertisement appearing in a May, 1954 issue of "Electrical Equipment Magazine." Slightly retouched for clarity.)

Panduit Corporation, on the other hand, emphasized that even if the material between the holes in Taylor could be considered "fingers," the convex crescents on the sides of that material were not "substantially parallel." The effect of this was that wires placed into the Taylor duct, and strung tightly through the holes in the side walls, could not be removed simply by deflecting the "fingers." Such wires, according to Panduit's evidence, would be trapped in the crescent-shaped side of the holes in the side wall.

The Walch Duct

[A23783]

(Figures 1 and 2 from the Walch patent. These figures illustrate Walch's early model, employing a wood backing strip and wire fingers. The patent office and the District Court[1] held that later models, with solid molded plastic fingers and backing strips, were substantively identical. We affirm that finding. Slightly retouched for clarity.)

To impeach Panduit's "taut wire" theory, Stahlin Bros. sought to admit a photograph of an electrical control panel in use in Pontiac, Michigan since 1954, which employs the one-inch Taylor duct, to prove that wires in electrical control panels are not strung tightly, but rather are strung loosely.

■ The District Court refused to accept the tendered exhibit, found that electrical control panels are, for the most part, tightly wired, and that the open hole of the Taylor duct traps tight wires, whereas the "substantially parallel slit" of the Walch duct does not. The District Court refused to admit the photograph upon its finding that it was "cumulative," redundant, and no more probative of Stahlin Bros.'s "slack wire" theory than other documents and testimony already in evidence. This finding, coupled with the fact that the exhibit had not been tendered "at least thirty days before the trial," as required by 35 U.S.C. § 282 (1964), justified, in our opinion, the District Court's exercise of discretion in refusing to admit the document.

Upon a review of all the evidence in this case, including the nearly 2,000 pages of exhibits admitted into evidence, this Court is well satisfied that the District Court had before it sufficient documentary and testimonial evidence of the nature of wiring in electrical control panels. Not only did the District Court admit several catalogues of the Panduit Corporation, Stahlin Bros., and Taylor Electric, all containing photographs of electrical control panels, but Mssrs. Caveney and Luc were cross-examined extensively on the basis of several exhibits showing electrical control panels with slack wires in them.

Furthermore, the impeaching document was not tendered until the first day of trial, even though the case had been pending for about four years, a pre-trial order having been entered in March of 1965. In view of the dozens of other photographs of control panels then before the District Court, many from the Appellant's own brochures, and in view of Stahlin Bros.'s failure to show prejudice as a result of the District Court's ruling, we do not believe that the District Court abused its discretion in rejecting the tendered documents. 35 U.S.C. § 282 (1964). *See* Rule 34, Federal Rules of Civil Procedure. We also find, upon review of the record in its entirety, that the District Court was not clearly erroneous in its finding that at least some of the wires in electrical control panels are strung tightly.

Stahlin Bros. also contends that the District Court was "clearly erroneous" in refusing to admit a photograph of a

---

1. *See also,* In re Caveney, 386 F.2d 917 (Ct.Cl. & Pat.App.1967).

"tear drop" duct allegedly manufactured by it, and a letter from Panduit's attorney to Stahlin Bros. indicating that he felt the "tear drop" duct infringed the Walch patent. The "tear drop" duct, which was not in existence at the time suit was commenced in this case, is similar to Walch device, except the fingers have slightly convex sides. Stahlin Bros. sought to introduce these exhibits to impeach Panduit's expert testimony that convex sides, such as those in the one-inch Taylor duct, are not "substantially parallel."

Eight months before the trial of this case, the District Court held a pre-trial conference where the Appellant first mentioned this new impeaching evidence. The District Court expressly stipulated at that time, and Stahlin Bros. agreed, that this duct and the Appellee's letter could be admitted as exhibits. Stahlin Bros., however, took none of the agreed-upon steps to have it properly introduced, offering it for the first time at trial. Insofar as the "tear drop" duct was not in suit, it was not in existence at the time the suit commenced, there is a conflict as to whether it was ever even manufactured, and the Appellant has, again, failed to allege any prejudice as a result of the District Court's rejection of the tender, we do not find this ruling to have been an abuse of discretion.

For the reasons stated by the District Court, which have not been drawn seriously into question, we agree that the Taylor duct was different in kind from the Walch patent. The presumption of validity of the Walch patent, strengthened by the protracted proceedings and unusually careful scrutiny given by the patent office in this case, *see* Hildreth v. Mastoras, 257 U.S. 27, 32, 42 S.Ct. 20, 66 L.Ed. 112 (1921) (interference proceeding); Modern Products Supply Company v. Drachenberg, 152 F.2d 203, 205 (6th Cir. 1945), cert. denied 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030 (1946), was not rebutted by the Taylor device.

Likewise, we agree with the District Court's finding that the Walch patent was not anticipated by the Franz patent. Unlike Taylor and Walch, Franz was not a trough, but a mere strip of material with hook-like projections emanating from its surface. The ends of the projections are flexible and may be deflected away from the backing member to allow wires to be "clipped" between the projections and the backing. The Franz patent has the same defect as did the Taylor device: it tended to "trap" wires, or prevent their removal, if strung tightly. In addition, the Walch device has many more openings per unit length than either Taylor or Franz, because in the latter the slits, or holes, are narrower than they are high. As the District Court noted:

> "There was no testimony that Franz made Walch obvious. That is easy to understand, since even by hindsight Walch is not obvious from Franz."

Stahlin Bros.'s arguments as to infringement here are the same ones made before the District Court. We find them to be without merit substantially for the reasons stated in the opinion of the District Court, which we shall not repeat.

The judgment of the District Court is affirmed.